SLT:TJS
F#:2010R01882

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -X

IN THE MATTER OF AN APPLICATION
FOR A SEARCH WARRANT FOR: THE
PERSONS KNOWN AND DESCRIBED AS
CHRISTOPHER BARRET,
KAREEM FORREST,
RYAN ANDERSON and
LEON SCARLETT

- - - - - - - - - - - - - - - - - -X

10 CR 809 (KAM)

AFFIDAVIT IN SUPPORT
OF AN APPLICATION FOR
A SEARCH WARRANT

(T. 21, U.S.C. § 846;
T. 18, U.S.C. § 924(c))

EASTERN DISTRICT OF NEW YORK, SS:

JOELLE ANDO, being duly sworn, deposes and says that she is a Special Agent with the Drug Enforcement Administration ("DEA"), duly appointed according to law and acting as such.

Upon information and belief, there is probable cause to believe that evidence of violations of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 924(c) to wit: conspiracy to distribute and possess with intent to distribute narcotics and and unlawful use of a firearm, will be obtained by the taking, and preserving as evidence, of buccal swab samples or blood samples of CHRISTOPHER BARRET, KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT (the "defendants").[1]

---

[1] Some of the courts that have addressed the issue have found that obtaining DNA via saliva is subject to the protections of the Fourth Amendment. See United States v. Nicolosi, 885 F. Supp. 50, 51-56 (E.D.N.Y. 1995) (Glasser, J.); In re Shabazz, 200 F. Supp. 2d 578, 581-85 (D.S.C. 2002). But see United States v. Owens, 2006 WL 3725547, at *6-17 (W.D.N.Y. Dec. 15, 2006) (finding probable cause not necessary for a saliva sample for DNA

The source of your deponent's information and the grounds for her belief are as follows:[2]

1. I am a Special Agent of the DEA, duly appointed according to law and acting as such. I have been a Special Agent with the DEA for approximately one and a half years and am currently assigned to the New York Field Division Drug Enforcement Task Force, where I am tasked with investigating narcotics trafficking, money laundering and other offenses. Based on my training, experience, participation in other narcotics investigations, executions of search and arrest warrants, debriefing of confidential informants and extensive discussions with other law enforcement officers, I have become familiar with the manner in which illegal drugs are imported and distributed, the method of payment for such drugs, and the efforts of persons involved in such activity to avoid detection by law enforcement. Prior to becoming a Special Agent of the DEA, I was a Connecticut State Corrections Officer for six and a half years.

2. The facts set forth in this Affidavit are based, in part, on my personal observations and experience, my

---

from an inmate); In re Vickers, 38 F. Supp. 2d 159, 165-68 (D.N.H. 1998) (permitting saliva sample by grand jury subpoena).

[2] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to search, I have not set forth all of the facts and circumstances relevant to this investigation.

participation in the investigation, conversations with other law enforcement officers and my review of documents and records pertinent to this case. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

PROBABLE CAUSE TO SEARCH THE SUBJECT TELEPHONE

3. Since 2009, the DEA, United States Postal Service ("USPS") and various local law enforcement agencies have been investigating a drug distribution organization based in Queens, New York, led by defendant CHRISTOPHER BARRET, also known as "Mouthy," "Chris" and "Solo." Members of the organization mail packages containing marijuana from Arizona and California to the Eastern District of New York, where the marijuana is sold by street level distributors. The marijuana is generally packaged inside large brown cardboard boxes, approximately 18 x 18 x 18 inches, filled with styrofoam peanuts. These packages are then sent through the mail using the United States Postal Service ("USPS"). Once the packages containing marijuana arrive in the Eastern District of New York, the marijuana is removed from the boxes and stored in various stash houses from where it is distributed throughout the metropolitan New York area. Members of the organization then either mail, electronically transfer, or have couriers transport the proceeds from the sale of this

marijuana from the Eastern District of New York to the sources of supply in California and Arizona.

4.  During the course of the investigation, law enforcement officers have identified KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT as members of BARRET's distribution organization.

5.  In January 2010, Postal Inspectors intercepted two large brown cardboard boxes that were shipped from members of the organization in Arizona to two mailbox drop locations in Queens used by co-conspirator ANDRE WILSON. Agents executed a search warrant on the boxes, which revealed approximately 40 pounds of marijuana.

6.  In August 2010, DEA agents installed a pole camera on the public street outside a suspected stash house in South Ozone Park, Queens, which was identified as the home residence of CHRISTOPHER BARRET (the "BARRET Residence"). During the course of the investigation, law enforcement agents, using both the pole camera and traditional methods of surveillance, have observed numerous individuals enter and exit the BARRET Residence carrying brown cardboard boxes consistent with the type of boxes used by the organization to transport marijuana through the mail.

7.  For example, on September 23, 2010, at approximately 7:00 p.m., law enforcement officers conducting surveillance again observed a Cadillac Escalade identified as

5

belonging to ANDRE WILSON, back into the driveway of The BARRET Residence. ANDRE WILSON and defendants OMAR MITCHELL and LEON SCARLETT removed two large brown cardboard boxes from the trunk area of the white Cadillac and took them into the BROWN Residence. An unknown male ("UM-1"), opened the rear passenger side door of the white Cadillac and removed another large brown cardboard box, which he took into the BARRET Residence. Another unknown male ("UM-2"), then placed a large white garbage bag into the trunk area of the white Cadillac, which then drove away from the BROWN Residence. Agents observed that the size and appearance of the packages removed from the white Cadillac were consistent with the intercepted packages discussed above. Based on my training and experience and the investigation that has been conducted thus far, I believe that the three brown cardboard boxes removed from the white Cadillac contained marijuana. I also believe that the large white garbage bag that was placed into the trunk area of the WILSON Escalade, contained packing materials, used in the shipping of the marijuana, for disposal.

8. On or about October 7, 2010, Postal Inspectors identified nine packages that were shipped from Arizona to the same two mailbox drops used by ANDRE WILSON. Agents conducted surveillance of the mailbox drops and observed ANDRE WILSON arrive driving the WILSON Escalade. WILSON was followed closely behind by a Nissan Qwest minivan, which was driven by the

6

defendant CHRISTOPHER BARRET. Agents observed WILSON retrieve a total of nine cardboard boxes from the two mailbox drops. Agents then followed WILSON and BARRET as they drove to the BARRET Residence and unloaded the boxes into the BARRET Residence. Once the boxes were unloaded into the BARRET Residence, WILSON and BARRET left the vicinity. ANDRE WILSON was subsequently arrested several blocks away from the BARRET residence while driving the WILSON Escalade. CHRISTOPHER BARRET was arrested approximately two blocks away from the BARRET Residence while driving the Nissan Qwest minivan.

    9. After observing WILSON and BARRET deliver the boxes of marijuana, agents executed a search warrant on the BARRET residence.[3] A number of invidualls were present inside the house at the time of the search, including KAREEM FORREST. RYAN ANDERSON was exiting the back of the BARRET residence as law enforcement officers approaced the back door.

    10. A number of other individuals, including LEON SCARLETT, fled the BARRET residence as the search was being

---

[3] On October 1, 2010, the Honorable Joan M. Azrack signed an order authorizing agents from the DEA to search the BARRET RESIDENCE for evidence of narcotics trafficking, including, but not limited to: telephones, SIM cards, financial records, drug records and money laundering records, including ledgers, papers, computer records and other documents reflecting information such as names, telephone numbers, addresses and financial records of individuals involved in trafficking in narcotics, books and records showing cash transactions and prices and/or quantities of narcotics purchased and payments received and surveillance equipment.

conducted. SCARLETT was found in an adjacent lot near a loaded .45 caliber Springfield Armory semi-automatic handgun (the ".45 caliber handgun").

11. The search of the BARRET residence revealed the nine cardboard boxes that WILSON and BARRET had previously brought into the BARRET Residence. Each of the boxes contained a green leafy substance that subsequently tested positive for marijuana. At least two of the boxes had been opened and bales of marijuana packaged into compressed brick-like objects had been removed from the boxes and placed on the kitchen counter. Agents also found a black garbage bag filled with marijuana elsewhere in the BARRET Residence, several heat-sealer machines, narcotics packaging materials consistent with the type found during the trash inspections discussed above, and a loaded semi-automatic .40 caliber pistol (the ".40 caliber handgun") that was found lying on the floor in the living room. A clear plastic bag containing marijuana and several thousand dollars in United States currency were also recovered from the bedroom of CHRISTOPHER BARRET. In total, agents recovered approximately 100 kilograms of marijuana from the BARRET residence.

12. On December 27, 2011, the grand jury returned a superseding indictment charging the defendants with conspiracy to distribute and possess with intent to distribute over 1000 kilograms of marijuana, in violation of 21 U.S.C. § 846, and

8

unlawful use of a firearm, in violation of 924(c)(1)(A).

13. Cooperating witnesses have indicated that handguns were handled and possessed by multiple individuals at BARRET's direction, including SCARLETT, FORREST and ANDERSON. In addition, cooperating witnesses have indicated that BARRET himself handled handguns.

14. On or about October 7, 2010, swabs from both handguns were submitted to the New York City Officer of the Chief Medical ("OCME") for testing.

14. On or about January 10, 2012, I received results of a DNA analysis conducted by "OCME" indicating that swabs from the ".45 caliber handgun" contained a mixture of three individuals DNA and that the DNA would be suitable for comparison.[4]

15. The DNA lab requires a DNA sample retrieved from CHRISTOPHER BARRET, KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT directly in order to perform and complete its analysis of the DNA recovered from the .45 caliber handgun. The DNA lab also requires a buccal swab sample or blood sample from CHRISTOPHER BARRET, KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT to obtain the necessary DNA.

16. There is probable cause to believe that the

---

[4] The swabs for the .40 handgun had insufficient DNA for analysis.

9

defendants will be found within the Eastern District of New York because each defendant is currently on trial in the United States District Court for the Eastern District of New York in a case captioned <u>United States v. Barret</u>, et al., 10-CR-809 (KAM).

  17. Based on the above information, there is probable cause to believe that CHRISTOPHER BARRET, KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT may be the source of DNA evidence found on the .45 caliber handgun. Therefore, there is probable cause to believe that a buccal swab sample or a sample of their blood constitutes evidence of the defendants participation in the charged crimes.

  WHEREFORE, your deponent requests that a search warrant be issued authorizing DEA Special Agents and other appropriate law enforcement and support personnel to seize and obtain from CHRISTOPHER BARRET, KAREEM FORREST, RYAN ANDERSON and LEON SCARLETT buccal swab samples or samples of their blood. An appropriately trained law enforcement officer, or an appropriately trained designee, will perform the cheek swabbing. The DNA samples sought herein will be collected by buccal swabbing. This method involves taking a sterile swab (similar to a Q-Tip) and gently scrubbing the inside right cheek, then the inside left cheek, for approximately five to 10 seconds. Two samples are requested in the event that one of the samples becomes contaminated or otherwise cannot be tested. A blood

10

sample will only be sought in the event that CHRISTOPHER ~~BATTER~~ BARRETT, KAREEM FORREST, RYAN ANDERSON or LEON SCARLETT refuses to submit to a buccal cheek swab.  In the event that a blood sample is taken, a licensed doctor or nurse or other qualified medical practitioner will take the sample.

                                        JOELLE ANDO
                                        Special Agent
                                        Drug Enforcement Administration

Sworn to before me this
12th day of January, 2012

        s/KAM
_____
UNITED STATES DISTRICT JUDGE
EASTERN DISTRICT OF NEW YORK